## Case No. 3,282.

COURCIER v. RITTER.

[4 Wash. C. C. 549;[1] 1 Am. Lead. Cas. 687.]

Circuit Court, E. D. Pennsylvania. Oct. Term, 1825.

PRINCIPAL AND AGENT—RATIFICATION.

1. General rule as to the duty of an agent in obeying the orders of his principal.

2. A merchant of Philadelphia sends a cargo of coffee to his correspondent at Bourdeaux, and writes as follows: "Make sale of the coffee immediately on arrival, and forward the returns in the articles mentioned below, by the same vessel." It was the duty of the agent to sell immediately on arrival, no matter at what loss, if he could; or as soon as he could. He had no right to exercise any discretion.

[Followed in Washington Fire & Marine Ins. Co. v. Chesebro, 35 Fed. 478.]

3. If the agent disobeys his orders, and makes a full and candid statement of all the facts on which his judgment was exercised to his principal, and the latter makes no objection to his conduct, or is silent respecting it, this amounts to a recognition of it, and will excuse the agent.

[Cited in Le Roy v. Beard, 8 How. (49 U. S.) 468; Norris v. Cook, Case No. 10,305.]

4. In the same case, the other part of the order was complied with; the agent sending the return cargo ordered, by the same vessel. The acceptance of that cargo by the principal, is no ratification of the agent's conduct, in not selling as soon as he could.

In October, 1812, the defendant, a merchant of Philadelphia, consigned to the plaintiff, a merchant of Bourdeaux, forty bags of coffee, weighing betwen five and six thousand pounds, which were accompanied by a letter of advice, apprizing him of the consignment, and containing the following order, viz. "You will please to make sale of the coffee immediately on arrival, and forward the returns in the articles undermen-

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

tioned, by the same schooner." The vessel was compelled to put in at Bayonne, where she arrived in December of that year, but was not permitted to land her cargo until the 24th of March, 1813, when the coffee was placed in entrepot. On the 9th of February, 1813, the plaintiff wrote to the defendant, announcing the arrival of the vessel at Bayonne, and stating that the times were very dull; that the cargo could not then be landed, but that he should ship him by the vessel, a return cargo as ordered; and concluding with assurances that he should use his best endeavours to obtain an advantageous sale of his coffee. On the 28th of April, 1813, he again wrote to the defendant as follows: "I have not been able yet to procure a sale for your coffee, but no exertions will be wanted to avail myself of the first favourable change in the market. Circumstances are not favourable at the present moment, and nothing but very dry and white Havanna sugars can command any sales." The plaintiff did not again address the defendant until the 21st of May, 1815, when he wrote to him and enclosed an account of sales, by which it appeared that the coffee had brought only one franc, seventeen centimes a pound, which made a considerable balance against the defendant, for which this action was brought.

For the plaintiff, it was contended: (1) That the operations of the hostile armies to the north, and in the Peninsula, during the year 1813, and down to the restoration of the Bourbons, produced a state of things which could not be known to, or anticipated by the defendant in October, 1812, and so reduced the price of all colonial produce in France, that had the plaintiff obeyed literally the order contained in the defendant's letter of October, 1812, he would have subjected his correspondent to a very considerable loss. That this was therefore a case where a consignee is justified in departing from the strictness of his instructions, and in exercising a discretion with an honest intention to promote the interest of his employer; and if he should be mistaken in his judgment, whereby a loss happens, it ought not to fall on the agent. 4 Binn. 361. (2) That if the law be otherwise, still, by accepting the return cargo, which was procured by an advance made by the plaintiff, and was not purchased with the proceeds of the outward cargo, and by not promptly objecting to the plaintiff's alleged violation of his orders, of which the letter of the 28th of April informed him, the defendant ratified what was done. 1 Ves. Sr. 509; 2 Term R. 188; 1 Emerig. Ins. 144, 145; 12 Johns. 300; 3 Cow. 281; 1 Yeates, 487.

The counsel for the defendant contended: (1) That the order being positive, nothing could excuse a violation of it but an inability to sell; the contrary of which is proved by the evidence. (2) The letter of the 28th of April, stating an inability to sell, disclosed no violation of the order; and consequently the silence of the defendant could not be a tacit ratification of an act of disobedience not stated by the plaintiff. The parol evidence given in the cause will be noticed in the charge.

Chauncey & Binney, for plaintiff.

Mr. Bradford and J. Sergeant, for defendant.

WASHINGTON, Circuit Justice. There are two questions for the consideration of the jury. (1) Were the defendant's orders disobeyed; and if they were, does the plaintiff stand excused by the circumstances which his counsel have urged in his favor? (2) If this point be against him, has the defendant, by his conduct, discharged him from the legal consequences of his disobedience?

1. The order contained in the letter of instruction which accompanied the coffee consisted of two parts: (1) To sell the coffee immediately on arrival; and (2) with the proceeds, to purchase a return cargo, to be forwarded by the same vessel. It will be necessary to keep in mind these parts of the order, when we come to the examination of the second question. The obvious meaning of the first part is: sell immediately on arrival, if you can, or as soon as you can. This results from the consideration that no person can be supposed to be so absurd as to require another to do what is impossible, nor can the other be supposed to contract to do it. The law contemplates no such case, and consequently makes no provision for it, otherwise than to excuse the party for the breach of a contract, the performance of which, circumstances have rendered impossible. Questions between principal and agent frequently occur in courts of justice, as to the construction of the orders which are alleged to have been violated, whether they are positive and unqualified, or leave a discretion with the agent. If they are so ambiguous that two constructions may fairly be given to them, every principle of justice demands that the want of precision in the writer should fix the loss, if any, upon him, rather than upon his correspondent. If the order leaves him a discretion, the law requires of him nothing farther than the exercise of a sound, honest judgment. But if the order be free from ambiguity; is positive, and unqualified; it must be rigidly obeyed, if it be practicable; and no motive connected with the interest of the principal, however honestly entertained, or however wisely adopted, can excuse a breach of it. This is a general and well established principle of law, to which I am aware of no exception.

It has been argued for the plaintiff, that no man can be supposed to act so absurdly as to mean that his property should be sacrificed, or even sold at a loss by his agents; and therefore, that the most positive order should be so construed as to give a direction where such a consequence, resulting from circumstances not known or contemplated by

the principal, would attend a strict performance of the order. But were this argument to receive the sanction of the court, it would be highly mischievous, by confounding all distinction between positive and discretionary powers, and thus unsettling well known and established principles of law. It would be particularly so to commerce, which cannot well be transacted but by the instrumentality of agents. Risk of profit or loss in foreign markets, is the inseparable attendant of the trade which is carried on with them; and yet no merchant in the possession of his reason ever did anticipate the incurring of the latter, much less the sacrifice of the articles consigned to his agent for sale there. But he knows that war, political occurrences, and unexpected glut of the foreign market with the articles on which he calculates to make a profit, as well as other causes, equally unexpected, may intervene to frustrate all his calculations. He may, from those considerations, deem it prudent to confer on his agent an unlimited, or a qualified discretion. But if he determine to rely solely on his own judgment, and to exclude all discretion in his agent; to sanction a latitude of action in the latter, beyond the rigid commands of his orders, would be to declare, what no person will attempt to maintain, that there is no intelligible difference between limited and unlimited powers. The principal could never be certain when he had given a positive order, and the agent could never know when he might, with safety to himself, exercise a discretion, and to what extent; since the circumstances of the different cases on which his judgment is to be employed, to find out when he may, and when he may not depart from his orders, will generally be various, and therefore always embarrassing. But so long as he is held to a strict compliance with an order plainly expressed, the principal can never complain, nor can the agent suffer; be the consequences to the former what they may. It has been observed that a strict compliance with the order in this case could not be observed, as the vessel arrived at Bayonne instead of Bourdeaux, and no sale could be made before the cargo was landed. The answer to the first part of the argument is, that the consignment was accepted by the plaintiff, after he knew of her arrival at the former port; and as to the second, the order was not disobeyed, if no sale could be made until the coffee was landed. The case of Dusar v. Perit, 4 Bin. 361, which the plaintiff's counsel supposed afforded an instance of an exception from the general rule which we have laid down, seems to us rather to illustrate and confirm it. In that case, the supercargo was authorised to sell the vessel and cargo at Havanna, at a certain price for each. He was compelled by misfortune experienced on the voyage to put in there and to unload, for the purpose of having the vessel hove down. Whilst in this situation, the limited price for the vessel was offered and accepted; and the market for the flour promised to equal that at which his instructions restricted him, and at which he actually sold a part; but before the sales of the whole cargo were completed, the market fell, and he was compelled to take, for the residue of the cargo, less than the limited price. As to that part of the cargo, the sale was a matter of uncontrollable necessity; since having, in compliance with his order, sold the vessel, and having no authority to purchase, or to hire another vessel, it was impossible to comply with his orders, in case the prescribed price could not be obtained, to proceed to another market. A strict compliance with the orders therefore, became impracticable.

The only question for the jury to decide on this point is, whether the order to sell immediately on arrival, was practicable? It is clear that it was not so until the coffee was landed. Was it then practicable? This is a question for you to decide upon the evidence. Two of the witnesses examined by the plaintiff, have deposed that the state of the market for all colonial produce, during the year 1813, was bad, and that the plan of holding up these articles was generally adopted by the merchants of Bourdeaux. One of them states, that during that year, sales were impossible. The other deposes, that till July, 1813, sales were made in Bourdeaux, but that after that month the price was nominal, there being no purchasers. The clerk of the plaintiff swears, that sales of coffee could not be made at Bayonne in that year; for which reason the plaintiff was unable to dispose of that consigned to him by the defendant. A fourth witness has sworn nearly to the same effect; and all of them agree, that the plaintiff adopted the same conduct in relation to his brother's coffee, as he did in the instance now under consideration; and that other merchants observed a similar policy, from a view to the interest of their employers. Upon this latter part of the evidence, it may be proper to observe, that it might have been of material importance, if discretionary powers had been confided to the plaintiff; but it can have no weight in a case like the present, where the order to sell immediately was imperative. On the other side, the captain of the vessel has deposed, that he had about the same quantity on board with that shipped by the defendant, which he sold at Bayonne, whilst it lay in entrepot, in two parcels, one for four francs twenty-five centimes per pound, and the other for four francs fifteen centimes per pound. But his officers were unable to dispose of the quantity which they took out. Two other witnesses, merchants of Bayonne, have deposed, that this article sold there from March to May, 1813, at from four francs twenty centimes to four francs forty centimes, and in June, at from four francs ten centimes to four francs twenty centimes; and that sales

at those prices were easily effected, both publicly and privately, during those months. If, upon this evidence, and the principle of law which has been stated, the jury should be of opinion that the plaintiff is chargeable with a breach of orders; the remaining question is, has the defendant by his conduct discharged him from the legal consequences of his disobedience? The plaintiff's counsel have very properly insisted, that, if the principal, being informed by his agent of his deviation from his orders, make no objection to his conduct, the law construes his silence into a tacit recognition of the act or omission, against which he will not be permitted afterwards to complain. The reason is obvious. He shall not, by his silence, place his agent in the predicament of losing all the gain which may result from his well intended disobedience, and yet be exposed to sustain the loss which a mistaken judgment, or unforeseen circumstances, may produce. But to entitle the agent to the benefit of this principle of law, it is incumbent upon him to act with the utmost good faith, by making to his employer a candid disclosure of his conduct, and of the causes which influenced it, in order that the latter may have the means of judging in respect to the course which it becomes him to adopt. The question then is, has such a disclosure been made by the plaintiff in this case? His counsel endeavour to excuse him upon the ground that political events, unknown to and unexpected by the defendant, had so depressed the price of all colonial produce in France, that sales could not be made of the coffee in question, after its arrival and being landed, without subjecting their principal to a heavy loss, and on that account he was justified in disregarding the strict injunctions of the order to sell immediately. But did their client make such a statement in his letter to the defendant of the 28th of April, 1813? This is its language: "I have not been able yet to procure a sale for your coffee, but no exertions will be wanted to avail myself of the first favorable change in the market. Circumstances are not favorable at the present moment, and nothing but very dry and white Havanna sugars will command any sales." He does not say that he has declined selling on account of the low price of coffee, which would subject his correspondent to a loss—but, that the sale of it is impracticable,—and that no colonial produce will command any sales except a particular kind of sugars. He discloses no breach of orders whatever, if the fact was that no sales could be made; and consequently the defendant's silence had no known violation of duty to recognize or to ratify. He had a right to conclude that, if no sales could then be made, yet, that regarding the original order, the plaintiff would sell as soon as it should be in his power to do so. No further communication was made to the defendant till March, 1815, when the letter, covering the account of sales, was written. If, then,

the jury should be of opinion, upon the evidence, that sales could have been effected at the time the letter of April was written, the silence of the defendant does not amount to a ratification of the plaintiff's conduct in not selling.

But it has been further insisted for the plaintiff, that the defendant, by his acceptance of the return cargo, although it was not purchased with the proceeds of the coffee, amounted to a dispensation from a strict compliance with the defendant's order. The court is of a different opinion. I have before observed, that that order consisted of two parts. One of them I have just disposed of; the other was, to purchase a return cargo with the proceeds of the coffee. This was not done, and consequently, the defendant might have refused to take that cargo to himself, or he might have received and sold it for his own security, but as the plaintiff's agent. But having chosen to pursue a different course, he cannot now, nor does he complain of a breach of that part of his order which pointed out no fund with which this cargo was to be purchased. But this has nothing to do with that part of the order which directed the plaintiff to sell the coffee immediately on its arrival. The whole cause then turns upon the question of fact, whether it was practicable to sell the coffee at all, at or after the time it was landed in 1813? If it was, the loss must be borne by the plaintiff.

The jury found for the plaintiff $443 damages, being about the balance claimed by the counsel in the event of his being considered as having broken his orders.